## Hatcher-Powers Shoe Company v. Bickford.

Hatcher-Powers Shoe Company v. Call.

Hatcher-Powers Shoe Company v. Charles.

Hatcher-Powers Shoe Company v. G. W. Coleman.

Hatcher-Powers Shoe Company v. O. L. Coleman.

Hatcher-Powers Shoe Company v. F. S. Huffman.

Hatcher-Powers Shoe Company v. R. T. Huffman.

Hatcher-Powers Shoe Company v. McCown.

Hatcher-Powers Shoe Company v. Morris.

Hatcher-Powers Shoe Company v. Mullins.

Hatcher-Powers Shoe Company v. Ratliff.

Hatcher-Powers Shoe Company v. Reynolds.

Hatcher-Powers Shoe Company v. Venters.

Hatcher-Powers Shoe Company v. Wright.

(Decided December 18, 1925.)

### Appeals from Pike Circuit Court

1. Principal and Agent—Son Held Not Liable on Stock Subscription Signed for Him by Father Without Authority.—Where father, without authority from son, signed latter's name to stock sub-

scription, and, on repudiation thereof by son, father withdrew subscription, and son never did anything ratifying the signature or confirming it, he was not liable thereon.

2. Corporations—Subscribers Held Without Right to Defeat Subscription for Alleged Misrepresentation of Promoters.—Where subscribers to stock in shoe corporation, who claimed that their subscriptions were procured on representation that expert in shoe business would take stock and do the buying, on learning that expert did not take stock, took no steps to have their names removed from subscription list, nor brought to corporation's notice that they proposed to cancel subscriptions, and did nothing to estop them to have stock issued to them, they cannot defeat actions on subscriptions on ground that promoters misrepresented facts.

3. Corporations—Subscribers to Stock had Right to Rely on Genuineness of Previous Signatures.—Since signature of each person on subscription paper for stock in company to be formed gave it his indorsement, every subsequent person had right to rely on fact that previous signatures were genuine, and that signers had subscribed for amount of stock indicated.

4. Contracts—Rescission is equitable Remedy, Awarded Only to the Diligent.—Rescission is purely an equitable remedy, and is never awarded to those who have not been diligent, and will thus cause a loss to others equally innocent.

5. Evidence—Absolute Contract for Stock Subscriptions Not Varied by Parol Proof of Agreement that Signers were to Pay or Not as they Saw Fit.—Absolute contract in writing whereby defendant subscribed for stock in corporation to be formed cannot be varied by parol proof that it was agreed that the signers were to pay or not as they might see fit.

6. Corporations—Stock Subscriptions Not Canceled by Act of Bookkeeper or Promoters.—Since neither promoters of corporation nor bookkeeper had power to release any of subscribers of stock from what they owed, even if they did undertake to do so, their illegal action had no effect on rights of the subscribers.

7. Corporations—Clerical Error in Minutes Held Not to Show Directors Acted Before they were Elected.—Where proof was conclusive that directors met on same day as stockholders, and just after stockholders' meeting adjourned, and that both meetings were held on April 23rd, clerical error in minutes that directors' meeting was on April 23rd, and that stockholders' meeting was on April 24th, held not to show directors acted before they were elected.

8. Corporations—One Subscriber should Not Subscribe for Stock as Trustee for Others.—Since Ky. Stats., section 539, provides that incorporators shall specify in the articles names and places of residence of each of its stockholders, and the number of shares of stock subscribed by each, one subscriber should not subscribe

as trustee for others to avoid necessity of having too many persons sign and acknowledge the articles.

JOHN W. WOODS, J. F. STEWART and ROSCOE VANOVER for appellant.

DAUGHERTY & BARRETT for Huffman, Charles, Call and Venters.

STRATTON & STEPHENSON for appellees Ratliff and Coleman.

ALEX L. RATLIFF for appellee Wright.

PICKLESIMER & STEELE for appellees Reynolds and Bickford.

OPINION OF THE COURT BY COMMISSIONER HOBSON— Affirming as to F. S. Huffman and reversing as to the other thirteen appellees.

In March, 1920, several men living in Ashland, Kentucky, or near there conceived the idea of organizing a corporation to carry on a wholesale shoe business there, and with this view they had a written contract drawn, which, so far as is material, reads as follows:

"THIS AGREEMENT, made and entered into at Ashland, Boyd county, Kentucky, this the 14th day of March, 1920, witnesseth, that,

"WHEREAS it is proposed to organize, under the laws of the state of Kentucky, a corporation under the name of 'Ashland Shoe Company,' or such other name as may be hereafter determined upon by the parties in interest, and

WHEREAS it is proposed that said corporation shall have an authorized capital stock of two hundred thousand ($200,000.00) dollars, divided into shares of one hundred ($100.00) dollars each; one hundred thousand dollars of said capital stock to be preferred stock, cumulative from and after January 1, 1920, and one hundred thousand dollars common stock,

"Which corporation shall be organized for the purpose of engaging in the business of wholesale jobbers of boots, shoes, rubbers and all kinds of footwear.

"Now, therefore, the undersigned, in consideration of their mutual promises and agreements, do severally agree to, and with each other, and with H. W. Hatcher, O. P. Powers and J. D. Leach, the

promoters of said corporation, that they will sub-
scribe for the number of shares of capital stock of
said company, set opposite their respective names.

"It is understood that the said promoters of
the said corporation, without subscribing for any
preferred stock, shall have the privilege of subscrib-
ing for fifty per cent (50%) of the common stock
of the said corporation sold  . . .

"This agreement is conditional upon the pro-
curing by the said Hatcher, Powers and Leach of
valid agreements of subscriptions to at least one
thousand (1,000) shares of one hundred ($100.00)
dollars each of said capital stock, and further that
no bonus, stock or compensation whatever is to be
paid or given to the said promoters, or to any one
for the organization or promotion of the said cor-
poration.  . . .

"Subscriptions shall be due and payable upon
ten days' call by the board of directors, after said
one thousand (1,000) shares shall have been sub-
scribed, at the rate of twenty-five per cent (25%)
of the subscription, and the remainder from time
to time, as the board of directors may determine.
. . ."

The paper was signed as follows:

| "Name | N. of Shares Preferred | Common | Total Amount to be Paid |
|---|---|---|---|
| O. P. Powers | 25 | 135 | $15,000.00 |
| H. W. Hatcher | 25 | 135 | 15,000.00 |
| James Hatcher | 34 | 17 | 5,100.00 |

. . ."

Thereupon O. P. Powers and H. W. Hatcher, as
promoters, started out taking subscriptions. When they
had obtained 102 other subscriptions, aggregating in all
about $135,000.00, they organized the corporation. The
articles of incorporation, so far as material, are in these
words:

"We, the undersigned, in order to form a cor-
poration for the purposes hereinafter set out, under
and pursuant to the provisions of the act of the
General Assembly of the Commonwealth of Ken-
tucky, entitled, 'An act providing for the creation
and regulation of private corporations,' which be-
came a law April 15, 1893, and the acts amendatory

thereof, and other statutes of the Commonwealth of Kentucky, in such cases made and provided, do hereby certify as follows:

## Article I.

"The name of this corporation shall be, 'Hatcher-Powers Shoe Company.'

## Article II.

"The principal office of this corporation shall be in the city of Ashland, Boyd county, Kentucky, but it may have offices and places of business at other places within or without the state of Kentucky.

## Article III.

"The object and purposes for which this corporation is formed are:

"To conduct the business of wholesale jobbers of boots, shoes, rubbers and all kinds of footwear; to buy, sell, manufacture and deal in boots, shoes, rubbers and all kinds of footwear; to buy and own real estate, erect buildings thereon, otherwise improve said real estate.  .  .  .

## Article IV.

"The amount of the total authorized capital stock of this corporation shall be two hundred thousand ($200,000.00) dollars, which shall be divided into two thousand (2,000) shares of the par value of one hundred ($100.00) dollars each, of which authorized capital stock one thousand shares, amounting to one hundred thousand ($100,000.00) dollars, shall be preferred stock, and one thousand shares amounting to one hundred thousand ($100,000.00) dollars shall be common stock.

## Article V.

" The names and post office addresses of the incorporators and the number of shares of stock subscribed by each stockholder are:

| "Name | Address | No. of. Shares |
|-------|---------|----------------|
| H. W. Hatcher, | Ashland, Kentucky | 400 |
| O. P. Powers, | Ashland, Kentucky | 400 |
| J. B. Leach, | Catlettsburg, Kentucky | 200 |

### ARTICLE VI.

"The corporation shall commence business as soon as practicable after these articles of incorporation are filed according to law in the office of the Boyd county court clerk at Catlettsburg, Kentucky, and the secretary of state at Frankfort, Kentucky, and shall continue for fifty years, unless sooner dissilved by a vote of at least two-thirds of the capital stock issued.

### ARTICLE VII.

"The affairs and business of the corporation shall be conducted by five directors, one of whom shall be elected president of the board, and another vice-president. The president of the board shall be the chief executive officer of the company . . .

"The board of directors shall have power to make all such by-laws and regulations to rule the business of said company, as will not be inconsistent with these articles of incorporation, or the laws of the state of Kentucky."

The articles of incorporation were filed and acknowledged by H. W. Hatcher, O. P. Powers and J. B. Leach. But Hatcher and Powers had each subscribed for only $15,000.00 worth of stock and J. B. Leach had subscribed for none and never took any.

Pursuant to notice sent to the stockholders the corporation was organized an April 23, 1920. Five directors were elected and the corporation began business. A call was made on the stockholders to pay 25% of their subscription. The corporation bought a large amount of shoes at the high price then prevailing. Prices fell; the corporation lost $112,272.73, and went into voluntary liquidation. The fourteen actions before us on this appeal are suits by the corporation against fourteen stockholders, who signed the above contract subscribing for the stock but failed to pay. They filed answer denying the allegations of the petition as to the steps taken to organize the corporation, also pleading that the subscription was obtained by misrepresentation and was conditional and had subsequently been cancelled by the corporation. In addition F. S. Huffman pleaded that his signature was unauthorized. A large amount of proof was taken and on final hearing the circuit court dismissed all of the petitions. The corporation appeals.

F. S. Huffman denied that he signed the writing at all or made any contract to take the stock. The uncontradicted proof is that his father, R. T. Huffman, signed his name to the contract without authority and that when he was told by his father what he had done he repudiated his action and his father told him that he would write the next morning and withdraw the subscription. The father did write the next morning and withdrew the subscription. F. S. Huffman never did anything ratifying the signature or confirming it. The circuit court, therefore, properly dismissed the plaintiff's petition against F. S. Huffman and the judgment in that case is affirmed.

After the organization O. P. Powers was the manager, Harry Hatcher was the treasurer and secretary and H. E. Barnett was the bookkeeper. When these suits were brought all the assets of the company, except the unpaid subscriptions, were exhausted and about $3,400 of debts were unpaid. It is conceded that all the other appellees signed the paper. Their chief defense is that they were procured by fraud to do this, the fraud consisting of the misrepresentation that Jeff Newberry, whom they knew well and who for many years had conducted a successful wholesale shoe business in Huntington, had subscribed for $25,000.00 of the stock, and was to be the manager and buyer of the new corporation, and by this representation, which was false and relied on as true, they were induced to make the subscription. G. W. Coleman's testimony may be taken as a sample of all of them. Put in narrative form, his testimony is, in substance, in these words:

"Powers and Hatcher told me that Jeff Newberry was going to be a stockholder to the extent of $25,000.00 and wanted $50,000.00 if he could get it; that Newberry was to do the first buying and he was to be the active manager. I signed with the agreement that if Newberry was not obligated I was not to be. I met Newberry, who told me he had nothing to do with it. I then met Hatcher and told him what Newberry said and told him I would not take my subscription. After this they sent me a notice and I saw Hatcher again and he said I forgot to tell Mr. Barnett; as soon as I get in I will tell him. Later I saw them and they said that the matter had been straightened up."

On the other hand, Hatcher and Powers testify that they simply told appellees that they hoped that Newberry would be in the corporation, but did not tell them that he had subscribed for $25,000.00 of stock, and did in fact tell them that Newberry said he could not allow his name to be used in the corporation. A number of letters were introduced written by appellees, but the only letter that says anything about Newberry is a letter of J. C. Charles, written more than a year after the corporation was organized, and when it had sustained losses. The letter of Coleman, written June 20, 1920, begs ''to advise it is out of my power to take stock as I have quite a lot of money tied up in the lumber and merchandise business and I am obligated as far as I can see my way clear at present.'' It does not appear that any of the appellees brought this matter promptly before the corporation. None of them attended the stockholders' meeting at which it was organized and none of them had any communication for some time with anybody but the promoter who had taken his subscription. Over a hundred people signed this subscription paper. A number of appellees were among the early signers. A number of persons signed after all of them had signed. The signature of each person on that paper gave it his indorsement, and every subsequent person had a right to rely on the fact that the previous signatures were genuine and that these persons had subscribed for the amount of stock indicated. In 1 Thompson on Corporations, section 727, the rule on the subject is thus stated:

''The general rule is that subscriptions procured on false and fraudulent representations of promoters cannot be avoided after the corporation is organized.''

Following this rule this court in Oldham v. Mt. Sterling Improvement Co., 103 Ky. 531, said:

''A corporation is not responsible for representations made by its promoters. The promoters of a corporation not in existence can not bind it as its agents, nor can the doctrine of ratification be invoked in order to charge a corporation with engagements made on its behalf before it was formed.''

It is unnecessary to determine whether this rule should be applied here; for while there is some conflict

of authority on the above rule, all the cases agree that to rescind, the subscriber must act promptly.  14 C. J. 615. The reasons for the rule are thus stated by the Michigan Supreme Court in St. John's Mfg. Co. v. Munger, 58 Am. St. Rpts. 473:

> "The proposition that such stockholder could charge the association with fraud because he was misled by the fraud of interested persons is suggestive of troublesome results. If this can be done, and the stockholder thereby escape payment for his stock, other stockholders, innocent of the fraud, would find their responsibilities proportionately increased, and the burdens of the concern would be shifted upon those members who were unable to show that they became such through the fraud of others. There would be little stability to corporations, and little safety to stockholders, if this doctrine should be sustained. In this case there not only was not a corporation in existence to be a principal, but the facts set up in the notice do not show that there was an agent of a corporation. The promoters were persons who represented the meeting, or possibly themselves, or some prospective stockholder, who for purposes of his own, desired to see the corporation organized. They cannot be said to be agents of the corporation in any sense. These subscribers contracted with each other to form a corporation, which they did. If one was guilty of fraud upon the others in procuring their subscriptions, a remedy should exist against such person.  Doubtless a subscriber who is induced by fraud to agree to join in the organization of a corporation may refuse to do so on discovering fraud; but, by carrying out his agreement and uniting with others, he has assumed new relations with them and the public, after which his remedy is restricted to action against the wrongdoers.  See 4 Am. & Eng. Ency. of Law 201, and notes; Carmody v. Powers, 60 Mich. 26."

The rule as to the protection of other subscribers is thus stated in 14 C. J., p. 602:

> "As against other subscribers or stockholders who have become stockholders after the subscription procured by fraud and presumably in reliance thereon, and who will sustain loss from a rescission,

the defrauded subscriber may undoubtedly, on general principles, be barred from a rescission if he has been guilty of laches either in discovery of the fraud or in rescinding after its discovery, even where the laches is not such as would bar a rescission strictly as between the corporation and the subscriber.''

It does not appear that any of the appellees on learning that Newberry had not taken stock in the corporation took any steps to have their names removed from the subscription. None of them took any steps to bring to the corporation notice that they proposed to cancel their subscription. None of them attended the stockholders' meeting for the purpose of organizing the corporation or took any steps to give notice then that they wanted on this ground to rescind their subscriptions. Under any view of the cases it was incumbent upon them to act promptly and bring to the notice of the persons interested the fact that they proposed on this ground to rescind their subscriptions. Being among the earlier subscribers they knew that other persons had subscribed after them, relying on their subscription, or at least they were bound to anticipate this. Many of these later subscribers not only subscribed but have paid their subscriptions without any notice of the infirmity claimed by appellees in their subscriptions. All the assets of the corporation are exhausted and to pay the debts it will be necessary to collect at least part of the subscriptions, and if this only were done the subscribers would not be equalized. The fact is if this corporation had made money and these subscribers had brought suit to get their stock, nothing that they have done as to the Newberry matter would estop them under the proof to have the stock issued to them, and receive the dividends accruing thereon. Under such circumstances, the corporation being now unable to pay its debts, they cannot defeat these actions on the ground that the promoters misrepresented to them the facts in regard to Newberry.

On this branch of these cases we rest our judgment on the ground that the misrepresentation as to Newberry did not render the subscriptions void, it only made them voidable at the election of appellees, and this election they were bound to make clearly and seasonably. This they did not do. Before the corporation was organized they communicated with no one but the promoter who had taken the subscription. They knew the corporation was

to be organized and that their subscriptions were included in those relied on. They were bound at least to know this when they received the notice to pay 25% of their subscriptions about May 1, 1920. It does not appear that any of them in response to this notice then asked that their subscription be canceled on account of the misrepresentation as to Newberry. It does not appear that any one of those who then paid 25% of their subscription was advised that appellees wished their subscriptions cancelled on account of the misrepresentation as to Newberry. They all knew then, or by ordinary care should have known, that Newberry was not a stockholder, for the company was organized and its books, that were open to all stockholders, showed the facts. Not making this a ground of rescission then, they cannot do so after financial straits have come on the corporation. Equality is equity. Rescission is purely an equitable remedy and is never awarded to those who have not been diligent and will thus cause a loss to others equally innocent.

The condition in the subscriptions relied on by appellees is thus stated by O. L. Coleman, and this may be taken as in substance the testimony of the other appellees: "They told me, 'if you will sign for this stock and when it becomes due you are not able to pay, all you have to do is to tell us.' I told both of them about a month later that I was not able to take my stock and not to count on me and they said that would be all right." The subscription paper was a contract in writing by which the signers agreed, "to and with each other and with H. W. Hatcher, O. P. Powers and J. B. Leach, the promoters of said corporation, that they will subscribe for the number of shares of the capital stock of said company set opposite their respective names." This absolute contract in writing cannot be varied by parol proof that it was agreed that the signers were to pay or not as they might see fit. In 1 Thompson on Corporations, section 633, the rule is thus stated:

"The rule that a writing will not be permitted to be altered or varied by parol applies with especial force to subscriptions; and the rule is settled by a long line of decisions that parol evidence is inadmissible to vary the terms of a subscription to the capital stock of a corporation."

In just such a case as this this court thus stated the rule:

"So far as the defendants or either of them alleged that their subscription was conditional and was not to be obligatory upon them, unless the road was located on a certain route, it is only necessary to remark that the contract being in writing, parol proof is inadmissible to alter its terms or to show that instead of being absolute as it purports to be, it was in reality conditional. The subscribers might have annexed a condition to the terms of their subscriptions, if they had thought proper to do so, and it would then would have been with the commissioners to determine whether such conditional subscriptions of stock would be received; but not having done so, they cannot, according to the well established doctrine on the subject, allege or prove that the contract was different from that which is evidenced by the writing, unless they can establish fraud or mistake in its execution." Wight v. Shelby R. R. Co., 16 B. Mon. 4.

There is no sort of evidence of mistake. The paper which appellees signed was a carefully drawn typewritten contract. They signed the paper as drawn. What they proposed to prove is not that there was a mistake in the paper, but that there was a side agreement that although they signed the paper they were not to pay unless they had the money.

When the corporation was organized the subscription paper was turned over to the secretary, who opened the stockholders' book, charging each stockholder with the amount of his subscription, and a notice was then mailed to each of them to pay 25% thereon. Appellees, C. A. Bickford, O. L. Coleman, W. W. Reynolds and W. P. Call, proved by the bookkeeper that on September 30th an entry was made on the journal and ledger showing the cancellation of their stock and of six other persons. On the other hand, the appellant proved by the bookkeeper that he did this by the direction of H. W. Hatcher and O. L. Powers and that the entry was made as a mere matter of form to avoid carrying the account over into a new book, as none of these parties had paid anything, and that the intention was not to release the subscription at all. That it was a mere matter of bookkeeping is also

shown by the fact that as the other calls were made the notice was sent to all the subscribers who had not paid. Neither Hatcher nor Powers nor the bookkeeper had any power to release any of the subscribers from what they owed the company, and it should not be presumed that they undertook to do so. But if they did their illegal action had no effect on the rights of the parties. Some of the other subscribers testify that Hatcher or Powers told them that their subscriptions had been cancelled. But this, too, could have no effect upon the fact. The directors took no such action, and from all the evidence it is plain that the corporation was trying to collect on these subscriptions.

The objections as to the legality of the forming of the corporation may be briefly disposed of. The minutes show that the stockholders' meeting was held on April 24 and the directors' meeting on April 23, and it is insisted that the directors acted before they were elected; but the proof is clear that the directors met on the same day as the stockholders and just after the stockholders' meeting adjourned and that both meetings were held on April 23; the date April 24, at the head of the stockholders' minutes, is simply a clerical error, which affected nothing.

It is also insisted that H. W. Hatcher by the articles of incorporation subscribed for four hundred shares, O. P. Powers four hundred shares, and J. B. Leach two hundred shares; but this would only make a thousand shares, and the stock of the company was two thousand shares. The proof for the plaintiff is to the effect that these men put these amounts of stock after their names only as trustees for other stockholders to avoid the necessity of having so many persons sign and acknowledge the articles and that this is customary in organizing corporations under the statute. The statute provides that the incorporators shall specify in the articles, "the names and place of residence of each of the stockholders and number of shares of stock subscribed by each." Kentucky Statutes, section 539. The purpose of the statute is to give the public notice as to who are the stockholders and the amount of stock that the incorporators hold. Its purpose would be entirely defeated by such a course as was followed here, and if such a custom has obtained it should be discontinued. It is unnecessary now to consider what the effect of this was on the liability of these three men to the corporation or its creditors, for they are

not defendants to this action, and if they have failed to pay anything they should have paid that is no reason why appellees should not pay what they owe. Appellees also show by Barnett, the bookkeeper, that Powers executed notes to the corporation for $20,000.00 for stock and that H. W. Hatcher also executed notes for a large amount and that these notes were afterwards cancelled. Hatcher and Powers say that they did not execute any notes. Hatcher paid $15,000.00, the full amount of his subscription, but Powers appears to have paid only $10,000.00. These matters are, however, immaterial in this action. If either of them owe anything, or if any notes that they executed have not been paid and should be paid, all this must be adjudicated in an action to which they are parties. Any stockholder may bring an action for the settlement of the affairs of the corporation, and in such an action, upon proper allegations and proof, all these matters may be determined.

The judgment in each of the other thirteen cases is reversed and the cause is remanded, with directions to enter judgment in favor of the plaintiff. Whole court sitting.